**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TERRY FRANCIS,**

        **Plaintiff,**

  v.                                    **Civil Action 2:20-cv-1684
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**OPINION AND ORDER**

Plaintiff, Terry Francis, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 4, 6). For the reasons set forth below, Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 15) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed his applications for DIB and SSI on May 19, 2015, alleging that he had been disabled since June 11, 2014, due to alcohol abuse/dependency and borderline personality disorder, epilepsy, torn tendons in shoulders from a previous injury, arthritis in neck, memory loss, and vertebrae damage. (Tr. 410–19, 507). Plaintiff later amended his onset date to January 1, 2016. (Tr. 450). After his applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held two hearings on March 8, 2018 and July 19, 2018. (Tr. 77–87, 88– 133). The ALJ denied benefits in a written decision on September 4, 2018. (Tr. 232–51). The Appeals Council granted review and remanded the case back to the ALJ. (Tr. 252–56).

A subsequent hearing was held on June 13, 2019. (Tr. 134–71). On July 17, 2019, the ALJ issued a decision again denying Plaintiff's applications for benefits. (Tr. 48–76). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on April 2, 2020 (Doc. 1), and, after several extensions, the Commissioner filed the administrative record on August 26, 2020 (Doc. 12). Plaintiff filed his Statement of Errors (Doc. 15), and Defendant filed an Opposition (Doc. 16). Plaintiff did not file a Reply, and the time for doing so has passed. Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

Plaintiff's statement of errors concerns his alleged physical impairments. (*See generally* Doc. 15). Accordingly, the Court limits its review of the testimony and evidence to the same. The ALJ helpfully summarized the relevant hearing testimony:

> He testified that he is unable to work because of pain on the whole left side of his body. He stated that he has pain in his left leg and left shoulder. He has difficulty sleeping because he cannot roll over. He stated that his pain averages 7 out of 10 (with 10 being the worst possible pain). Medications do not provide any significant relief from his symptoms.
>
> The claimant testified that this self-employment was serving as a disc jockey. He also testified that his self-employment included mowing lawns, which he did approximately 10-15 times over the course of the four years of reported self-employment, being paid no more than $50 per mow.

(Tr. 59–60, 66).

### B. Relevant Medical Evidence:

The ALJ summarized the relevant medical records concerning Plaintiff's impairments. These records span roughly a four-year period, from late 2015 up to and including 2019.

1. *July 13, 2015–May 23, 2018*

In finding Plaintiff was not disabled, the ALJ reviewed Plaintiff's medical records, beginning in 2015:

> David Bousquet, M.Ed. performed a consultative examination in July 2015, and he opined that the claimant "may have some problems with his abilities to conform to social expectations and that he may have difficulties with abilities to respond appropriately to work place stresses and pressure."

(Tr. 57).

> The claimant underwent a consultative examination with Sushil Sethi MD in August 2015, a few months before the amended alleged onset date. Dr. Sethi diagnosed possible mild degenerative disease with normal x-rays; epileptic seizures under control with Depakote; history of remote motor vehicle accident with no neuromuscular deficit; and chronic alcoholism. Dr. Sethi performed objective studies, which showed:
>
>> The x-rays of the right shoulder (two views) show normal bony alignment. There is no fracture, dislocation, or osteophyte formation. The joint surfaces are smooth and the joint spaces are normal.
>>
>> The x-rays of the cervical spine show mild to moderate degenerative disease at C5- 6 with osteophytes anteriorly. The C5-6 intervertebral space is reduced by 5 mm to 3 mm. The rest of the intervertebral spaces are 8 mm. The neural foramina are widely patent. There is no spondylolisthesis of the cervical spine.
>
> Exhibit 2F/7. Physical examination showed some decrease in range of motion in the bilateral shoulders, but range of motion of the cervical spine was normal (Exhibit 2F/2). He had normal range of motion in the bilateral elbows, wrists, hands, and fingers (Exhibit 2F/3). He had normal range of motion in the bilateral hips, knees, and ankles (Exhibit 2F/4). He had 5/5 strength in the bilateral shoulder abductors, shoulder external rotators, shoulder internal rotators, elbow flexors, elbow extensors, wrist flexors, wrist extensors, finger abductors, finger adductors, hip flexors, hip extensors, knee, flexors, knee, extensors, foot dorsiflexors, foot plantar flexors, foot invertors, foot evertors, and great toe extensors. He had normal bilateral grasp, manipulation, pinch, and fine coordination (Exhibit 2F/1).
>
> Based on the physical findings from the consultative examination, Dr. Sethi opined that:
>> MEDICAL SOURCE STATEMENT: Based on my objective findings, the claimant's ability to do work-related physical activities

3

> such as sitting, standing, walking, lifting, carrying, and handling objects may be slightly affected. He can sit 8 hours, walk 8 hours, and stand 8 hours. He can carry 30-50 pounds frequently and 60-100 pounds occasionally. His hearing, speaking, and traveling are normal.

(Tr. 60).

> Two independent State Agency Medical Consultants [Maureen Gallagher, DO (1A); and Michael Delphia, MD (5A)] considered the claimant's physical complaints on August 31, 2015 and March 23, 2016, respectively, and they both agreed the claimant was capable of medium exertional work (Exhibits 2A and 5A).
>
> During subsequent treatment, the claimant did not evidence significant worsening as compared to the consultative examination until approximately May 2018. November 2017 treatment notes from UPMC Neurology showed that the claimant's epilepsy was well controlled on Keppra (Exhibit 8F/2). Physical examination showed normal strength and sensation, and the claimant reportedly had a negative musculoskeletal physical examination (Exhibit 8F/3). His gait and stance were considered normal (Exhibit 8F/4). During a subsequent physical examination in January 2018, the claimant noted to have a normal narrow based gait, and assessed with 5/5 strength in the bilateral biceps, triceps, interossei, and hip flexors (Exhibit 8F/15).
>
> As discussed above, in May 2018, Dr. Timms observed no focal weakness during his physical examination of the claimant. However, that same month, the claimant presented to the Ohio State University with complaints bilateral shoulder pain. The claimant had abnormalities in the bilateral upper extremities on physical examination:
>
>> Bilateral UE exam shows trace positive atrophy in the bilateral supraspinatus fossae, negative deformity or skin changes. Well-healed anterior left shoulder incision. There is tenderness at bicipital groove and anterior joint line bilaterally. ROM of the affected left shoulder is 50/90-160 /hip versus the contralateral shoulder 50 /80-160 /hip. negative crepitus. Strength on the affected side 5-/5 with ER, 4/5 with FE and 5-/5 with IR versus contralateral side 5-/5 with ER, 4/5 with FE and 5-/5 with IR. Affected bilateral shoulder Pain is present with resisted elevation - no both sides - very painful exam overall.
>
> Exhibit 21F/262. The claimant was diagnosed with status post left RCR with pain concerning for new RC pathology, likely right RCT, likely right biceps tendonitis, and likely left biceps tendonitis (Exhibit 21F/262). The observation that the claimant had some trace atrophy and reduced strength in the bilateral upper extremities suggests he would be unable to lift as much as 50 pounds and that he would have some difficulty with bilateral overhead reaching. Further, May 2018

4

> imaging of the lumbar spine found degenerative changes at L4-5 and L5-1 with signs of disc desiccation noted at L4-L5 and L5-S1, but without significant spinal canal stenosis. Notably there was only mild diffuse disc bulge and bilateral facet arthropathy at L4-L5 and bilateral pars defects and mild diffuse disc bulging and facet arthropathy at L5-S1. (Exhibit 37F/6). In light of these findings, the undersigned has limited the claimant to an exertional level less than that opined by the State Agency Medical Consultants.

(Tr. 61).

> 2. *May 24, 2018–April 29, 2019*

The ALJ continued her evaluation, turning next to the relevant medical records from May 2018 through April 2019.

> On August 31, 2018, claimant presented to Dr. Reynolds and they discussed results of an August 15, 2018 EMG. He noted right carpal tunnel that "bothers" the claimant. At that time, they discussed possibility of a release and the claimant indicated that he would "think about it." (Exhibit 27F/7). Apparently, the claimant has sought no further treatment of carpal tunnel, indicating to the undersigned that this condition caused no more than a minimal limitation upon is functioning.

> When claimant presented to Dr. Reynolds on February 28, 2019, Dr. Reynolds again notes the 5/5 strength in the upper and lower extremities and a normal gait ad able to heel and toe walk showing good strength. (Exhibit 30F/3). [ ]

> With regards to axonal polyneuropathy (Exhibits 27F/51, 29F/3, 30F/3) again, the record does not support decreased strength, other than the visit with the DPM in reference to the left ankle. In September of 2018, Dr. Farris notes that claimant does have deceased sensation to touch in the hands and arms, but claimant was moving all limbs purposefully, with no obvious asymmetry, upper limb atrophy or deformity. He noted the claimant's range of motion of the shoulders is intact and normal with flexion, extension, side bending and rotation. He found the claimant's muscle strength in the upper extremities was 5/5. (Exhibit 34F/19). On August 31, 2018, claimant presented to Dr. Reynolds and they discussed the August 15, 2018 EMG noting a length dependent relatively symmetric predominately axonal polyneuropathy. It is noted that on September 28, 2018, the claimant indicated he had no limitations in bathing or dressing himself, writing, or feeding himself (Exhibit 27F/17). When claimant presented again to Dr. Reynolds on February 28, 2019, Dr. Reynolds again notes the 5/5 strength in the upper and lower extremities and a normal gait and able to heel and toe walk showing good strength. (Exhibit 30F/3). Dr. Reynolds also notes that the claimant has normal sensation to light touch over the bilateral upper and lower extremities, noting that previously there had been a decrease (in sensation) over the 1st toe bilaterally (30F/3).

5

(Tr. 63–64).

> Continued treatment records indicate the claimant sought no more than conservative ongoing treatment of his allegedly disabling conditions with diagnostic testing finding no significant worsening of his conditions. On February 4, 2019, the claimant presented to Dr. Hackshaw (Rheumatology) on a referral from Dr. [Reynolds], for "Patient with diagnosis of fibromyalgia with neck and low back pain and diffuse arthralgia. Please evaluate and treat and follow as needed." (Exhibit 35F/3). Dr. Hackshaw assessed the claimant, noting swelling of the joints was absent. Synovitis was absent. Range of motion of the upper and lower extremities was normal. Control points were negative, but painful tender points were elicited in greater than 11 of 18 sites with moderate hyperalgesia. However, examination revealed a normal gait. Muscle strength testing revealed 5/5 strength in the upper and lower extremity flexor and extensor muscle groups. There was edema of both legs to mid tibial shaft noted. Dr. Hackshaw reviewed the claimant's cervical spine MRI from May 23, 2018. Dr. Hackshaw assessed that the claimant had degenerative disc disease, cervical and neuropathic symptoms. Noting that the claimant does meet hypersensitivity criteria in terms of painful tender points to classify as fibromyalgia. Dr. Hackshaw titrate down the claimant's Gabapentin to help reduce some of the pedal edema. (Exhibit 35F/4). Notably, these findings did not support conditions of the severity alleged by the claimant.
>
> With regards to the claimant's history of epilepsy/seizure with history of tumor, the longitudinal medical evidence of record indicates this condition remains under control with medications. (Exhibits 1F; 2F; 8F/12; 31F/6; 15F/3; 24F/2). In fact, throughout the record Dr. McLean notes that the claimant's seizure disorder is well controlled with only an aura on occasion. The undersigned finds the above residual functional capacity more than accommodates any ongoing limitations associated with this condition with the reduction to the light exertional level with prohibition on the climbing of ladders, ropes, and scaffolds and exposure to hazards.
>
> Providing the claimant with the utmost benefit of the doubt, the undersigned has also made fibromyalgia/chronic pain a severe impairment, whether it is chronic pain syndrome or fibromyalgia or neuropathic pain, it is not readily apparent from this record. Regardless, to accommodate the pain issues, the undersigned reduced the claimant to the light exertional with a restriction to climbing of ladders, ropes, or scaffolds and exposure to hazards. Notably, the undersigned has not provided any further restrictions as the record consistently demonstrates that the claimant presents with a normal gait and 5/5 strength in the upper and lower extremities. (Exhibits 24FF/3, 34F/5, 31F/6). Further, examination on February 28, 2019 noted the claimant had a normal gait and was able to heel and tow walk showing good strength. Exhibit 30F.
>
> Turning to the claimant's history of shoulder pain degenerative joint disease, the undersigned notes the medical evidence of record indicates the claimant has sought conservative treatment of these conditions and physical examination does not

6

> support a totally disabling upper extremity condition. In fact, examination on February 4, 2019 indicated the claimant had normal range of motion of the upper extremities with five out of five strength in the upper extremities. (Exhibit 35F/4). [ ]
>
> [C]onsistently throughout the record the claimant presents with a normal gait and 5/5 strength of the lower extremities. At the consultative examination, the claimant's hip range of motion was assessed as within normal limits (Exhibit 2F/4). In December of 2017, claimant was able to ambulate for a 6-minute walk test without resting (Exhibit 22F/1). On September 28, 2018, claimant presented to Dr. James Dreessen, who noted claimant was able to "toe/heel walk and tandem gait" and that he had a "normal" gait. (Exhibit 27F/21). Dr. Dreessen noted that claimant has a three year history of chronic pain in neck, shoulders, lumbar back, hips, knees, feet and hands. He noted that "his pain appears to be primarily myofascial as well as components of neuropathic pain from diabetic neuropathy and carpal tunnel syndrome." He noted that he discussed indications for a neurosurgery referral but noted that claimant does not have weakness or radicular pain. (Exhibit 27F/23). He assessed the claimant with bilateral greater trochanteric bursitis and provided injections. In February 2019, the claimant presented to Dr. Hackshaw for an initial evaluation for chronic pain. Upon exam, Dr. Hackshaw found the claimant's range of motion in upper and lower extremities to be normal. Synovitis was absent. Control points were negative. But painful tender points were elicited in greater than 11 of 18 sites. Claimant had a normal gait, his affect was assessed as normal, and muscle strength testing revealed 5/5 strength in the upper and lower extremity flexor and extensor muscle groups. Edema of both legs as noted. (Exhibit 35F/4). On February 28, 2019, Dr. Harold Reynolds, also assesses the claimant with 5/5 muscle strength in the upper and lower extremities. He finds the claimant to have some decreased ROM of the shoulders and hip. But finds the claimant to have "a normal gait and was able to heel and toe walk showing good strength." (Exhibit 30F/2). [ ]

(Tr. 62–63).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on June 30, 2018, and has not engaged in substantial gainful activity since June 11, 2014, his initial alleged onset date of disability. (Tr. 54). The ALJ determined that Plaintiff suffered from the following severe impairments: epilepsy/history of seizures under control with medications, history of tumor, mild degenerative changes of the Acromioclavicular ("AC") joint in the right shoulder with tiny insertional tear and underlying rotator cuff tendinosis/tendinitis, axonal polyneuropathy, history of

7

avulsion fracture along the dorsal aspect of the talus in left foot, degenerative disc disease of cervical and lumbar spine, greater trochanteric bursitis bilateral hips, and fibromyalgia/chronic pain. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 58).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: work should not require greater than frequent stooping or climbing of ramps or stairs; work should never require climbing ladders, ropes, or scaffolds; work should not exposure to unprotected heights or dangerous unshielded moving mechanical parts; work should not require greater than occasional overhead reaching; work should not require greater than occasional exposure to concentrated levels of extreme cold or wetness; and work should not require greater than occasional exposure to concentrated level of respiratory irritants.

(Tr. 59).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 60).

After reviewing the relevant medical records, the ALJ afforded Dr. Flynn's opinion "little weight." (Tr. 64–65). Regarding Dr. Flynn's March 8, 2018, letter, the ALJ opined:

> Dr. Flynn completed a form where she indicated that the claimant was moderately impaired in his ability to stand and walk. She indicated he was severely impaired in his ability to lift, carry and handle (Exhibit 5F/4). Yet, as discussed above, the claimant consistently had a normal gait and normal strength until May 2018 when he had a mild decrease in strength on physical examination.

(Tr. 64). Similarly, the ALJ afforded "little weight" to Dr. Flynn's June 2018 medical source statement form:

> On June 18, 2018, Dr. Flynn rendered yet another opinion, this time detailing the

8

> limitations of the claimant by filling out a medical source statement form provided by the claimant. She assessed significant (i.e., disabling limitations), yet her "medical findings that support this assessment" is simply to refer to her treatment notes. A review of those notes does not fully support the severity of the limitations she has assessed. While she checked the block that indicated the claimant needed unscheduled rest breaks, she did not address the question of how much additional rest time would be required on an average day. She offered no explanation when assessing severe limitations on the claimant's ability to perform manipulative movements or her findings with respect to environmental issues. As discussed above, the claimant had normal grip and fine manipulation during his consultative examination and he had no severe respiratory impairments. On May 23, 2018, claimant presents to Dr. Reynolds who notes that claimant's strength is intact in both arms and legs, "he is not dropping things or tripping," but notes that claimant does allege that "he has numbness in the fingers and hands when he is sitting and sometimes with activity but not at night yet." (Exhibit 10F/2). Even more telling are the treatment notes of Dr. Flynn, who on December 10, 2018 assessed the claimant with "bilateral equal grips, no sensory deficits. Able to ambulate on own power with good coordination." (Exhibit 26F/10).
>
> Dr. Flynn further noted that the claimant *has been prescribed oxygen* [emphasis added] and yet, it does not appear that this is medically necessary, as a review of the record does not demonstrate the need for, use of, or prescription for supplemental oxygen. Further, in December 2017, a six minute walk test performed demonstrated the claimant ambulated for 6 minutes without resting and his oxygen saturation at the end of the test was 90 (Exhibit 21F/225). Consistently throughout the record the claimant presents with clear lungs without dullness or hyperresonance, rales, rhonchi, wheezes or rubs. (Exhibit 23F/7). In fact, when claimant presents to the lung and sleep disorder center 9 on April 24, 2019, it is noted "he takes Dulera on a daily basis but admits he has not used it in the past few weeks. He has albuterol for rescue and also a DuoNeb nebulizer." (Exhibit 36F/2). Dr. Weiland examines the claimant and finds his lungs "clear to auscultation bilaterally. No wheezing, rhonchi or rales." (Exhibit 36F/2). There is absolutely no mention of the medical necessity for oxygen, or that the claimant is claiming to be using oxygen. This further undermines the supportability of the opinion of Dr. Flynn and the opinions she provides are not supported by either her own treatment notes, explanation, or the longitudinal record, thus little weight is assessed to these multiple opinions.

(Tr. 65).

Finally, as to the opinions of the Consultative Examiner Dr. Sushil Sethi and State Agency Medical Consultants Dr. Maureen Gallagher and Dr. Michael Delphia, the ALJ found:

> [Dr. Sethi's] opinion is accorded partial weight. The use of the phrase "slightly affected," is vague. However, Dr. Sethi provided specific findings with respect to

9

> sitting, walking, standing, and lifting. These findings are accorded significant weight because they are consistent with findings of normal strength and range of motion from the consultative examination.
>
> The fact that [Dr. Gallagher and Dr. Delphia] reached consistent conclusions heightens the persuasive power of each opinion. These opinions are consistent with the physical findings from the consultative examination and the medical source statement prepared by the consultative examiner. The State Agency Medical Consultants accurately depicted the claimant's functional limitations at least insofar as they pertain to the date of the most recent assessment, as such, the undersigned affords these opinions significant weight.

(Tr. 60–61).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff is able to perform his past relevant work as a disc jockey. (Tr. 66). She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, since January 1, 2016. (Tr. 66– 67).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538

10

(6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff argues that the ALJ erred in two respects. He begins by asserting that the ALJ failed to give appropriate weight to the opinions provided by his treating physician, Dr. Freeda Flynn. (Doc. 15 at 17–20). Plaintiff then contends that the ALJ mischaracterized his past relevant work as a disc jockey ("DJ"), resulting in an improper determination that he could return to that work. (*Id.* at 20–22). The Court addresses each argument in turn.

### A. Treating Physician's Opinion

Two related rules govern how the ALJ was required to analyze Dr. Flynn's opinions. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[1] The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)

---

[1] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016). Plaintiff's claim was filed on May 19, 2015, so the previous treating physician rule still applies here.

11

(alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied . . . " *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id*. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243 (alterations in original)). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Dr. Flynn issued several opinions as to Plaintiff's physical functioning, two of which Plaintiff claims were not afforded the correct weight—a March 2018 letter and a June 2018

12

medical source statement. As discussed below, the ALJ provided good reasons for discounting these opinions, so remand is not warranted.

### 1. Dr. Flynn's Letter

To begin, the ALJ properly assessed Dr. Flynn's March 2018 letter. In her letter, Dr. Flynn opined that Plaintiff suffers from multiple comorbidities, specifying eleven diagnoses, the combination of which "meets the criteria" for disability. (Tr. 893). She further noted that, as of the date of the letter, his conditions are "currently controlled." (*Id.*). Notably, the form does not provide the bases for these conclusions. (*Id.*).

Contrary to Plaintiff's argument (*see* Doc. 15 at 17–20), the ALJ properly considered whether Dr. Flynn's opinion is well supported and consistent with the other substantial evidence in the record. She also provided good reasons for affording it "little weight." Specifically, she noted that Dr. Flynn failed to "provide a function-by-function analysis of what the claimant was capable of doing despite his diagnosis." (Tr. 64). Plaintiff, conversely, claims that regardless of this alleged failure, the ALJ still failed to appropriately evaluate Dr. Flynn's opinions in conjunction with the overall record. (Doc. 15 at 18). However, this is precisely what the ALJ did.

The ALJ found Dr. Flynn's opinion "largely unsupported [by both] her own treatment notes, [and by] the overall record." (Tr. 57). She notes that while "Dr. Flynn completed a form where she indicated that the claimant was moderately impaired in his ability to stand and walk" and that "he was severely impaired in his ability to lift, carry and handle . . . the claimant consistently had a normal gait and normal strength until May 2018 when he had a mild decrease in strength on physical examination." (Tr. 64).

The Court finds that the ALJ properly considered Dr. Flynn's letter and clearly articulated good reasons for discounting it. *See Rogers*, 486 F.3d at 242 (holding that reasons must be

sufficiently clear to a reviewing court as to the basis for the weight assigned). And, within her discretion, the ALJ afforded little weight to this opinion given its internal inconsistencies, which is an acceptable "basis [] to disregard the opinion of a treating doctor." *Goodman v. Astrue,* No. 3:11-cv-00012, 2012 WL 293152, at *10 (S.D. Ohio Feb. 1, 2012). Plaintiff has shown no reversible error with regard to this opinion.

### 2. Dr. Flynn's Medical Source Statement Form

The same is true concerning Dr. Flynn's checkbox form. (*See* Tr. 957). On the form, Dr. Flynn observed that Plaintiff had chronic pain which impaired sleep. (Tr. 960). Dr. Flynn noted that Plaintiff could carry and lift up to ten pounds, stand without limitation, walk for up to one hour in an eight-hour workday, and sit for two hours per workday. (Tr. 957). She further opined that Plaintiff could "rarely" reach, push/pull or perform fine or gross manipulations and would require restrictions around machinery, temperature extremes, and noise. (Tr. 958). Finally, Dr. Flynn opined that Plaintiff would require time to alternate positions between siting, standing, and walking at will. (*Id.*). Dr. Flynn left blank the spaces on the form which asked, "what are the medical findings that support this assessment[.]" (*Id.*). In fact, despite the form's instructions otherwise, Dr. Flynn repeatedly failed to provide additional information about these diagnosis and restrictions. (*See id.*).

The ALJ thoroughly analyzed this opinion and subjected each specific finding to proper scrutiny. To start, despite Plaintiff's contention otherwise (*see* Doc. 15 at 17–20), the ALJ properly considered whether the form is well-supported and consistent with other substantial evidence in the record. She also provided good reasons with regard to each opinion. Specifically, the ALJ afforded "little weight" to the varying degree of limitations checked on the form, explaining that Dr. Flynn "fail[ed] to provide any rationale to support these findings . . . ma[de] no citation to her

14

own treatment notes, [and] a review of her treatment notes (or the longitudinal record) in [no] way support[s] these significant limitations opined by Dr. Flynn." (Tr. 57). And while Dr. Flynn references her "treatment notes" as supporting her medical findings, "[a] review of those notes does not fully support the severity of the limitations she has assessed." (Tr. 65).

Regarding the specific limitation for rest breaks, the ALJ explained:

> While [Dr. Flynn] checked the block that indicated the claimant needed unscheduled rest breaks, she did not address the question of how much additional rest time would be required on an average day. She offered no explanation when assessing severe limitations on the claimant's ability to perform manipulative movements or her findings with respect to environmental issues. As discussed above, the claimant had normal grip and fine manipulation during his consultative examination and he had no severe respiratory impairments.

(*Id*.).

Similarly, the ALJ afforded "little weight" to Dr. Flynn's specific opinion regarding Plaintiff's need for oxygen. (*See id*.). The ALJ explained that, while "Dr. Flynn further noted that the claimant has been prescribed oxygen [], it does not appear that this is medically necessary, as a review of the record does not demonstrate the need for, use of, or prescription for supplemental oxygen." (*Id*.). The ALJ elaborated even further:

> Consistently throughout the record the claimant presents with clear lungs without dullness or hyperresonance, rales, rhonchi, wheezes or rubs. [(citations omitted)]. In fact, when claimant presents to the lung and sleep disorder center on April 24, 2019, it is noted "he takes Dulera on a daily basis but admits he has not used it in the past few weeks. [(citations omitted)]. Dr. Weiland examine[d] the claimant and finds his lungs "clear to auscultation bilaterally. No wheezing, rhonchi or rales." [(citations omitted)]. There is absolutely no mention of the medical necessity for oxygen, or that the claimant is claiming to be using oxygen.

(*Id*.).

At base, the ALJ found Dr. Flynn's unsupportable as her opinions "are not supported by either her own treatment notes, explanation, or the longitudinal record, thus little weight is assessed to these multiple opinions." (*Id*.).

15

The Undersigned concludes that the ALJ's detailed analysis of each portion of Dr. Flynn's form satisfies the good reasons requirement. *See Rogers*, 486 F.3d at 242 (holding that reasons must be sufficiently clear to a reviewing court as to the basis for the weight assigned). Paramount here is whether ". . . the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). The ALJ has provided such a clear understanding here.

Furthermore, "check-off" forms like Dr. Flynn's may be entitled to less weight when they "provid[e] very little explanation of the information [] relied upon in forming the opinion." *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566– 67 (6th Cir. 2016). As the ALJ repeatedly notes, that is the case here. *See id*. ("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that did not cite clinical test results, observations, or other objective findings") (internal citations and quotation marks omitted).

Finally, the ALJ did not, as Plaintiff contends, improperly hold Dr. Flynn's opinion to greater scrutiny than she did the opinions of the non-examining source. (Doc. 15 at 18). Relying on only the opinion of a non-treating source to discredit the opinion of a treating source is inappropriate. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (opining that the treating-physician-rule would be toothless if it could be overcome simply by contradictory evidence from nontreating and nonexamining doctors).

But that is not what occurred here. True, at various points in her decision analyzing the opinions of Plaintiff's treating physicians, the ALJ referenced the opinions of the Consultative Examiner Dr. Sushil Sethi and State Agency Medical Consultants Dr. Maureen Gallagher and Dr.

16

Michael Delphia. (Tr. 60–61). Notably, while the ALJ adopted many of their opinions, the ALJ added additional restrictions to the RFC. (Tr. 59, 61); *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (explaining that an ALJ's decision to include further restrictions than opined by the state agency's physician supported him giving little weight to the opinion of plaintiff's treating physician).

More importantly, as discussed above, in discrediting the opinions of Plaintiff's treating physician, the ALJ consistently cited the discrepancies between the objective medical record and Dr. Flynn's opinions. The relevant regulations and case law make clear that this is an appropriate reason for discrediting the opinion of a treating source. *See* 20 C.F.R. § 404.1527(c)(2); *see also Friend*, 375 F. App'x at 551. In other words, the ALJ did not rely solely on the opinion of a non-treating source to discredit the opinions of Dr. Flynn. *Cf. Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors."). And the Undersigned finds no fault with the ALJ's analysis on this ground.

### B. Past Relevant Work

Plaintiff also contends that the "vocational expert erred in her characterization of his past relevant work . . . and the ALJ unquestioningly adopted the expert's mistaken testimony." (Doc. 15 at 22). Plaintiff alleges that his work as a DJ, as preformed, was markedly different than the characterization offered by the vocational expert and adopted by the ALJ. (*Id*.). Specifically, the DOT description offered by the vocational expert did not contemplate how Plaintiff's DJ work at weddings and bars differs from a traditional "studio DJ." (*Id*. at 21).

Up front, the Commissioner contends that "Plaintiff and her counsel have waived any challenges to this issue by not bringing it up prior to the ALJ's decision." (Doc. 16 at 19).

17

Specifically, he notes that "when given the opportunity to question the [vocational examiner] on any and all substantive issues, Plaintiff and her attorney declined to ask any questions about this topic." (*Id*.). "[Plaintiff] also declined to give a closing argument bringing up this issue, raising it with a post-hearing briefing to the ALJ or Appeals Council, or asking for post-hearing interrogatories to the [vocational examiner]." (*Id*.). As a result, contends the Commissioner, Plaintiff has forfeited this argument. The Court agrees.

The Sixth Circuit recently held that any such vocational issues should be explored at the administrative level. *O'Neal II v. Comm'r of Soc. Sec*., 799 F. App'x 313, 317 (6th Cir. Jan. 7, 2020). There, the Court held that "[b]ecause the DOT continues to be recognized as a source of reliable job information and [plaintiff] did not cross-examine the vocational expert when he had the opportunity, the vocational expert's testimony constitutes substantial evidence to support the ALJ's finding that [plaintiff] was able to perform work that existed in significant numbers in the national economy." *Id*; *see also Kepke v. Comm'r of Soc. Sec*., 636 F. App'x 625, 636 (6th Cir. 2016) (holding that "because [plaintiff] failed to probe [her issue with the ALJ's questioning of the VE] at the ALJ hearing, she forfeited [that] argument"); *Beinlich v. Comm'r of Soc. Sec*., 345 F. App'x 163, 168–69 (6th Cir. 2009) (explaining that the ALJ did not err in his findings based on the VE's testimony, when plaintiff failed to raise any challenge until after the ALJ's decision was issued); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) ("We now hold that, at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal.").

Here, while Plaintiff cross examined the vocational expert, he failed to ask any questions about her characterization of his past relevant employment. (Tr. 165–167). Furthermore, even when Plaintiff requested—and was granted—an extension to seek review by the Appeals Council,

18

this issue was not raised. (Tr. 345–352). "Accordingly, the ALJ reasonably relied on the [vocational examiner]'s testimony that Plaintiff can perform his past relevant work because Plaintiff failed to cross-examine the [vocational examiner] on the issue at the administrative hearing." *Turner v. Comm'r of Soc. Sec.*, No. 2:19-cv-900, 2019 WL 5781608, at *7 (S.D. Ohio Nov. 5, 2019). In sum, because he failed to raise this issue at the administrative level, despite being afforded multiple opportunities to do so, Plaintiff has waived any objections to the ALJ's reliance on the vocational examiner's testimony.

It is worth noting that even if the argument was not waived, the ALJ did not err in her classification of Plaintiff's past relevant work. The regulations define "past relevant work" as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). "[T]he claimant bears the burden of proving … the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). Satisfying this burden requires a claimant to demonstrate that he cannot perform his past relevant work as "actually performed" and as "generally required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, at *2 (1982).

In determining whether a claimant can perform their past relevant work, the ALJ "will ask [a claimant] for information about work [they] have done in the past," and it "may use the services of vocational experts or vocational specialists … to obtain evidence" to determine whether a claimant "can do [their] past relevant work, given [their] residual functional capacity." 20 C.F.R. § 404.1560(b)(2). The ALJ may properly rely on a vocational examiner to develop the record regarding a claimant's past relevant work experience. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x

19

369, 374 (6th Cir. 2006) (noting that "under the SSR 00–4p, the ALJ is entitled to evaluate the testimony of a vocational expert, the DOT, and other relevant evidence . . .").

The ALJ did exactly that in this case. (Tr. 66) ("In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally and actually performed."). Accordingly, as the ALJ properly relied on the vocational expert's testimony, the ALJ did not err in her determination that Plaintiff could return to his past relevant work. *See Martin*, 170 F. App'x at 374 ("Nothing in SSR 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.").

## IV. CONCLUSION

The Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 15) and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date: January 15, 2021                         /s/ Kimberly A. Jolson
                                               KIMBERLY A. JOLSON
                                               UNITED STATES MAGISTRATE JUDGE